**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES et al., Plaintiffs,**

v.

**Stanley R. RESOR, Secretary of the Army, et al., Defendants.**

**Civ. A. No. 74–70.**

United States District Court, District of Columbia.

Nov. 21, 1974.

---

Edward L. Merrigan, Smathers & Merrigan, Washington, D. C., for plaintiffs.

Ellen Lee Park, Asst. U. S. Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

WADDY, District Judge.

This action, arising under the federal civil service laws, is before the Court on defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment. Plaintiffs are five civilian employees of the Department of the Army and the Department of the Air Force[1] and the American Federa-

tion of Government Employees (AFGE), a labor organization representing federal civil servants. Plaintiff AFGE is recognized by both the Army and Air Force as the exclusive bargaining agent for civilian employees in units in which collective bargaining agreements have been executed. Defendants are the Secretaries of the Army and Air Force and the Commissioners of the Civil Service Commission. Plaintiffs claims, briefly stated, involve the legality of the Army's and Air Force's Reserve Technician Programs (hereinafter referred to as ART), which require as a condition of employment that personnel in the programs maintain membership in the Army and Air Force Reserves. It is alleged that the reserve membership requirement violates various provisions of the civil service laws and that the agreements between the Civil Service Commission and the Army and Air Force establishing the ART programs are unlawfully vague. Plaintiffs ask the Court to declare illegal and to enjoin the operation of the ART programs. In addition, the individual plaintiffs seek injunctive and monetary relief with respect to administrative actions taken against them.

## FACTS

### I.

The material facts in this case, as set forth below, are undisputed. There being no genuine issue as to any material fact, summary judgment may be entered pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The Civil Service Commission (CSC), on June 25, 1957, informed the Department of the Air Force that it was approving the Department's proposed ART program, under which specified technical positions in the career civil service would be filled only by persons who became and remained members of the ac-

---

1. Although the plaintiffs alleged in their complaint that this action is brought on their own behalf and on behalf of a class of civil service employees, a petition to certify as a class action has not been filed. Accordingly, the Court does not treat this as a class action and the discussion which follows is limited to the facts presented and relief claimed by the named plaintiffs.

tive Air Force reserve.[2] Applicants would be required to compete for these positions through competitive examinations, as is true for other positions in the competitive service.[3] Incumbents would receive the regular pay of their civilian jobs, plus military pay for the time spent in military status (e. g., weekend reserve duties). A memorandum issued by the CSC shortly after its initial notification to the Air Force outlined the operation of the new plan and noted that it was designed "to increase mobilization readiness of Air Reserve flying units."[4]

Prior to the initiation of the ART program an Air Force Base consisted of two separate organizational units: "Flying Centers" and "Reserve Wings." The latter are combat organizations comprised of active reservists who receive periodic military training. The Flying Center, on the other hand, is made up of both military and civilian personnel engaged primarily in maintaining and operating the Base's facilities. As a result of the inauguration of the ART program the following changes were brought about:

> Under the Air Reserve Technician Plan, the Air Reserve Flying Centers and the Reserve Wings will be integrated organizationally to provide within each Wing a permanent cadre or "hard core" of highly skilled personnel available for immediate mobilization. This hard core will consist of civilian reservists who in their civilian capacity will provide the basic functions of maintenance, supply, etc., heretofore provided by Air Reserve Flying Center personnel, and in addition in their military capacity will provide training for the remainder of the wing personnel who will continue to report only on weekends and during summer active duty tours. The hard

core will constitute on an average approximately 20% of the strength of each flying wing.

> . . . . . .

The Air Force will assign to all ART positions comparable military designations and ranks. It is important to recognize that the civilian job and the military assignment are the same. This program includes the establishment as civilian positions of many combat type jobs that heretofore have always been held by active duty uniformed personnel. including such jobs as wing commanders.[5]

This merger of military and civilian functions at the Air Bases was further explained in a Continental Air Command "Personnel Policy and Procedures Manual" issued on April 7, 1958:

> At present an Air Reserve flying center is the responsibility of and operated by an Air Force organization which is apart and separate from the Air Reserve flying unit being trained at the location. This organization is composed of approximately half military and half civilian personnel. Its primary mission is to maintain equipment and operate an Air Force facility to be used by an Air Reserve flying unit in accomplishing its training. To the extent possible, it does assist in the training of Reserve personnel though the responsibility for this training is properly that of the Air Reserve flying unit. On the other hand, there is the Air Reserve flying unit which utilizes the facility and equipment in providing for inactive duty training on the equivalent of one weekend per month and for one two-week period of active duty per year. Other than occupying and utilizing the same facility there is, at present, no direct connection or relationship between these two organizations. The

2. Letter from Harris Ellsworth, Chairman, Civil Service Commission, to David F. Smith, Assistant Secretary of the Air Force, June 25, 1957.

3. See 5 U.S.C. § 2102.

4. Civil Service Commission Letter No. 57–45, June 28, 1957.

5. *Id.* at 2, 4.

ART Plan provides generally for a consolidation of these two units through integrating that portion of the permanent party support requirement, which is directly related to the tactical portion of the Air Reserve flying unit, into the Reserve unit utilizing that facility. The majority of the positions thus integrated will be designated as ART and will be identified with an identical or comparable position in the Air Reserve flying unit.[6]

A CSC manual entitled "Recruitment of Air Reserve Technicians Through Competitive Examination" informed civil service examiners of the nature of the ART program, instructing them that the reserve technicians were to enjoy all benefits accruing to other employees in the competitive civil service.[7] However, the ART positions were clearly defined to comprise a separate competitive level[8] because of the reserve membership requirement. Although the manual advised that any future budget reductions would proportionately affect ART and non-ART personnel, the latter employees could not transfer into an ART position, in the event of a RIF, unless able and willing to meet the reserve requirements.[9]

On July 5, 1960 the Chairman of the CSC advised the Department of Defense that the proposed Army Reserve Technician program was approved pursuant to an eight-point Memorandum of Understanding, with the following proviso:

This approval is based on our understanding that the Department of Army is in full agreement with the provisions of the enclosed Memorandum of Understanding, and will carry out both in letter and spirit the commitments it has made and the safeguards it has promised to apply with respect to employees who would be affected by the plan. It is also understood that the department of Army will comply fully and strictly with the requirements of the Veterans' Preference Act of 1944 and the Commission's regulations under that act in all of its activities under the plan.[10]

In November, 1960 the CSC issued a manual entitled "Recruitment of Army Reserve Technicians Through Competitive Examination"[11] which was similar to its Air Force counterpart. The manual incorporated the terms of the Memorandum of Understanding, including the condition that "[t]he lack or involuntary loss of military status will not be a basis for removing present or future civilian employees."[12] However, the Army program, as the Air Force's, devised separate competitive levels for ART and non-ART employees,[13] the distinguishing criterion being the reserve membership requirement.[14]

6. CONACM 40–1 at 4, April 7, 1958.

7. CSC FPM Supp. 930–71, August, 1966 (replacing Handbook X–151). The manual noted that the duties of certain civilian positions, such as operations and training officers, would include the briefing of combat crews and the training of reserve members. CSC FPM Supp. 930–71, August, 1966.

8. See 5 C.F.R. § 351.403.

9. The manual also discussed the possible overlap of ART and non-ART functions, in spite of the maintenance of distinct competitive levels. It was advised, however, that no more than 30% of an ART employee's responsibilities should be devoted to non-ART duties. FPM Supp. 930–71, Appendix at A–4.

10. Letter from Roger W. Jones, Chairman, Civil Service Commission, to Charles C. Finucane, Assistant Secretary of Defense, July 5, 1960.

11. CSC FPM Supp. 930–72, August, 1960.

12. Memorandum of Understanding ¶ 2.

13. The manual provided that ART positions could also be filled on a non-competitive basis. FPM Supp. 930–72 at 3.

14. The duties of the ART employees were identified as "preparation and maintenance of personnel records and files, payrolls for the members of the unit, military correspondence, instruction in Army regulations and procedures, interview and personnel processing of new members of the unit, screening of qualifications, placement and assignment of duties, determining retirement points, and personnel and administrative guidance to members of the reserve units." Id., Appendix C at C–1.

## II.

On January 7, 1969 plaintiff Erwin P. Rolf, a preference eligible employee [15] of the Air Force, received notice of a RIF action, as a result of which he was reduced in grade and transferred from a position as flightline mechanic to warehouseman. Rolf was denied transfer into an ART position because he could not satisfy the reserve membership requirements. He subsequently appealed the RIF action, arguing that the conditions of entrance into the ART program violated his rights as a preference eligible employee, including his retention rights.[16] The appeal was denied by both the Philadelphia Regional Office of CSC and the Board of Appeals and Review (BAR).[17]

Plaintiffs Guttenberger and Meadows, preference eligible civil servants at McGuire Air Force Base, received general notices of a RIF action on May 6, 1969. Neither of these plaintiffs was a member of the active reserves at the time of the RIF. Offers of reassignment to lower grade positions at McGuire were extended to both employees. Guttenberger accepted the reassignment, while Meadows declined the offer.[18] Appeals of the RIF actions were taken by both of these plaintiffs to CSC's New York Regional Office, arguing that the duties of these employees' positions were being continued after the RIF and that the jobs were being performed by Reserve personnel in lower retention status.

The New York Regional Director advised Guttenberger and Meadows, on August 14, 1969, of the rejection of their appeal. The letters, identical in content, stated that the RIF actions were necessitated by fund limitations and were not the result of the reorganization of the Base following initiation of the ART program. As to the argument that these plaintiffs had priority over reserve members with lesser retention rights, the letter reiterated the position that ART employees are in a competitive level distinct from the levels occupied by non-ART personnel. The letter further stated:

> The duties formerly performed by you are not being performed by the Air Reserve Technicians but are being performed by other civilian employees or military personnel. It should be noted that the Air Reserve Technician personnel perform a separate function and exist solely for the purpose of training reservists during training weekends and active duty encampment.[19]

Neither Guttenberger nor Meadows appealed the decisions to the CSC Board of Appeals and Review.

Plaintiffs Morton and Minnich were employed by the Army at the Indiantown Gap Military Reservation, Annville, Pennsylvania at the time of the Department's ART reorganization. Pursuant to the provisions in the agreement between the CSC and the Army, these employees were reassigned to positions within the ART program, in spite of the fact that neither was a member of the reserves.[20] When Morton and Minnich later requested assignment to higher-grade positions within the ART program, they both were informed that the transfers would be approved pending satisfaction of the requirements for membership in the reserves. However, Ms. Morton failed to meet the physical requirements for reserve membership, while Mr. Minnich was denied transfer

15. See 5 U.S.C. § 2108.

16. See 5 U.S.C. §§ 3312, 3351, 3502, 3504.

17. Decision dated August 7, 1969.

18. Meadows later accepted reinstatement to a different position, effective September 2, 1969.

19. See letter from Robert J. Drummond, CSC Regional Director, to John S. Guttenberger, August 14, 1969.

20. See CSC FPM Supp. 930–72 at 1, providing that non-reservists occupying technician positions may continue to serve in their jobs after the ART reorganization, although they are subject to reassignment as reservists become available to perform the technicians' duties.

from the retired to the active reserves because of his age. As a result of their failure to satisfy the reserve requirement, plaintiffs Morton and Minnich were informed that their transfers would not be approved.[21]

## LAW

This action was filed January 12, 1970, prior to the enactment of the District of Columbia Court Reform and Criminal Procedures Act of 1970, 11 D.C.Code § 101 et seq. (1973 ed.). Jurisdiction is therefore conferred on this Court pursuant to 11 D.C. Code § 521 (1967 ed.). Jurisdiction may also be premised on section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, empowering the district courts to review certain agency actions without regard to the amount in controversy. Pickus v. U. S. Board of Parole, 507 F. 2d 1107 (D.C.Cir. 1974).

*Exhaustion of Administrative Remedies*

Defendants raise a preliminary issue of the failure of plaintiffs Meadows and Guttenberger to exhaust all available administrative remedies. These two plaintiffs both appealed their RIF actions to the appropriate CSC regional office. They did not, however, take a further appeal to the Board of Appeals and Review, as they were entitled to do under the civil service regulations. 5 C.F.R. § 772.307. Defendants contend that disregard for this final appeal procedure barred Meadows and Guttenberger from availing themselves of judicial resolution of their claims. See Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938).

■ Although a plaintiff is not required to pursue futile administrative procedures before initiating judicial action, Lodge, 1858, AFGE v. Paine, 141 U.S.App.D.C. 152, 436 F.2d 882 (1970), plaintiffs do not assert that the appeal procedures of the CSC were ineffectual in rectifying their alleged grievances. Nor could they argue that the Board of Appeals previous rejection of plaintiff Rolf's challenge to the ART program excused them from further administrative action.[22] Although the BAR rejected Rolf's claim that the Air Force ART program *per se* was in violation of the civil service laws, this determination did not foreclose all further challenges to the implementation of the program at other Army and Air Force facilities. Any RIF action will usually present distinct factual issues peculiar to each affected employee, especially with respect to his or her competitive area, competitive level, seniority and possible veteran preference. In Meadow's and Guttenberger's initial appeals they specifically attacked the mechanics of the ART reorganization at the McGuire Air Force Base, alleging that there was an improper transfer of non-ART job functions to ART positions. These issues were not resolved by Rolf's appeal of a RIF action instituted at another Air Force facility. For these reasons the Court concludes that plaintiffs Meadows and Guttenberger failed to exhaust their administrative remedies by not appealing to the BAR and are precluded from litigating their claims before this Court. McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); Young v. Higley, 95 U.S.App.D.C. 122, 220 F.2d 487 (1955). These plaintiffs' claims are hereby dismissed.

■ Defendants have also argued that plaintiff Minnich failed to exhaust his administrative remedies by not seeking a waiver of the age provisions barring his transfer into the active reserves. Army Regulation AF 140–315 allows for such waiver upon a showing that the employee is "indispensable" to the ART program and has at least five years remaining before mandatory re-

---

21. Letter from John E. Bayler, Chief, Employment Services Branch to Frances Morton, Jan. 5, 1968; letter from John E. Bayler to Samuel Minnich, May 14, 1969.

22. The BAR's decision in Rolf's case was entered on August 7, 1969. Rejections of Guttenberger's and Meadow's appeals by the New York regional office were dated August 14, 1969.

moval from active status. The administrative record filed with defendants' summary judgment motion indicates, however, that Minnich could not transfer into the active reserves precisely because he had passed the mandatory retirement age. AF 140–315 would seem not to apply. In addition, neither plaintiff nor defendants establish any basis for Minnich's indispensability to the ART program. Any attempt to seek a waiver under the regulation would have been a meaningless gesture which this plaintiff was not required to pursue. See Lodge 1858, AFGE v. Paine, *supra*.

### Civil Service Commission's Authority To Establish The ART Programs

This is not the first case in which the legality of the ART programs has been in issue. See Baum v. Zuckert, 342 F.2d 145 (6th Cir. 1965); Chloros v. Zuckert, C.A.No. 1233–64 (D.D.C. Order granting summary judgment to defendants March 17, 1965); Horvath v. Commissioners of Civil Service, No. 64 C 1312 (N.D.Ill. Order granting summary judgment to defendants Oct. 14, 1965). In each of these actions the court rejected challenges to the ART programs. In spite of these precedents, a detailed reexamination of the issues raised by plaintiffs in this action is warranted by the enactment, subsequent to the entry of the above-cited decisions, of legislation creating a National Guard technician program similar to the ones adopted by joint approval of the CSC, Army and Air Force. National Guard Technicians Act of 1968, 32 U.S.C. § 709.[23]

The Department of Defense is an executive agency authorized to employ civil servants to the extent the necessary funds have been appropriated by Congress. 5 U.S.C. § 3101. The military departments of the Army and Air Force have the same statutory authority. *Id.* When operating within the confines of the civil service laws the military departments, as other components of the executive branch, must abide by the def-

initional requirements of Title 5, including section 2101, which provides:

> [the civil service] consists of all appointive positions in the executive, judicial, and legislative branches of the Government of the United States, except positions in the uniformed services . . .

The uniformed services include, *inter alia*, the Army and Air Force. 5 U.S.C. § 2102(2).

An initial issue presented by the agreements between the two military departments and the CSC, and inferentially raised by plaintiffs, is whether the ART programs unlawfully assign civilian personnel to the performance of military functions, thereby ignoring the statutory barrier between the civil and uniformed services. Section 2102 suggests that an Army or Air Force employee who is engaged in military duties (the extreme example being combat functions) could not be considered a civil servant.

Acceptance of the latter proposition, however, does not compel the conclusion that when military personnel perform the same duties assigned to civilians the civil service status of the latter is tainted. Apart from the easily identifiable combat roles, the duties of a given job do not alone determine whether an employee is in the uniformed or civil service. To take an easy example, there would seem to be no problem with having civilian clerk typists perform their jobs in coordination with military personnel who fulfill their military obligations as clerk/typists. Similarly, reserve technicians who are employed as flight mechanics do not become *de facto* uniformed personnel merely because these same job functions have been or continue to be performed by members of the military.

As to the mechanics of the ART operation, the agreements between the agencies explicitly distinguish between the ART employees' military and civilian

---

23. The legality of the National Guard Act was upheld in Local 371, AFL–CIO v. Brink, C.A. No. 2688–70 (D.D.C. Order June 22, 1972).

functions. As with non-ART employees, the technicians' duties and responsibilities during the working day are governed by the civil service laws and regulations. Promotions, RIFs, etc. are subject to civil service procedures. When working in their civilian capacities, the technicians do not wear military uniforms and are not required to follow the rules of "military courtesy." [24]

As far as practicable, the CSC has taken precautionary steps to ensure the separation of military and civilian obligations. In this respect, the technicians are in a position similar to other civil service employees who voluntarily maintain membership in the reserves. Participation in reserve activities is not *per se* an unlawful interference with an employee's status as a civil servant. The Court further concludes that compulsory membership in the reserves should be viewed as a condition of employment akin to other prerequisites imposed on employees for entrance into and maintenance of their positions (e. g., an attorney's admission to practice before a Bar). This condition is not violative of the statutory definition of the civil service.

Plaintiffs point to two additional statutory provisions which allegedly indicate Congress' concern for the separation of military and civilian functions. First is 5 U.S.C. § 2105(c):

> An employee paid from nonappropriated funds of the Army and Air Force Exchange Service, Army and Air Force Motion Picture Service, Navy Ship's Stores Ashore, Navy exchanges, Marine Corps exchanges, Coast Guard exchanges, and other instrumentalities of the United States under the jurisdiction of the armed forces conducted for the comfort, pleasure, contentment, and mental and

physical improvement of personnel of the armed forces is deemed not an employee for the purpose of —

> (1) laws (other than subchapter IV of chapter 53 and sections 5550 and 7154 of this title) administered by the Civil Service Commission . . . [25]

The simple response to the proposed applicability of this provision is that the technicians are paid from appropriated funds [26] and therefore are not included within this narrow exception to the general rule that civilian employees of the military departments are subject to the civil service laws. Further, the reserve technicians do not fit the description of employees who are referred to in this provision. The ART programs certainly are not "conducted for the comfort, pleasure, contentment, and mental and physical improvement of personnel of the armed forces."

The second citation proffered by plaintiffs is subsection (d) of the same statute:

> A Reserve of the armed forces who is not on active duty or who is on active duty for training is deemed not an employee or an individual holding an office of trust or profit or discharging an official function under or in connection with the United States because of his appointment, oath, or status, or any duties or functions performed or pay or allowances received in that capacity.

Contrary to plaintiffs' interpretation, this statute merely states that during those times when a reservist is not on active duty, or on active duty only for training purposes, he is not deemed an officer or employee of the United States and may engage in certain activities which might normally be foreclosed to

---

24. See Memorandum of Understanding, ¶¶ 6, 7.

25. See Bowen v. Culotta, 294 F.Supp. 183 (E.D.Va.1968) for an explanation of nonappropriated fund activities.

26. See testimony of Maj. Gen. Tom E. Marchbanks, July 29, 1969, Hearings on the Department of Defense Appropriations before the House Subcommittee of the Committee on Appropriations, 91st Cong., 1st Sess.

him.[27] There is no implication that reservists may not hold positions in the civil service or that civil servants may not be required to join the reserves as a condition of employment.

### Legality of the ART Programs In Light Of the Enactment of the National Guard Technician Act of 1968

When Congress considered the Guard technician bill in 1968 there already existed state technician plans which required membership in the National Guard as a continuing requirement for civilian employment. The federal statute carried over many of the features of these state programs, including compulsory membership in the Guard, but additionally provided for the inclusion of the technicians in the federal civil service, subject to certain exceptions:

> (d) A technician employed under subsection (a) is an employee of the Department of the Army or the Department of the Air Force, as the case may be, and an employee of the United States. However, a position authorized by this section is outside the competitive service if the technician employed therein is required under subsection (b) to be a member of the National Guard. . . .
>
> (f) Sections 2108, 3502, 7511, and 7512 of title 5, United States Code, do not apply to any person employed under this section."[28]

Both the Senate and House Armed Services Committee Reports [29] explained that the primary reason for enactment of the legislation was to convert the National Guard technicians from state employees, who had been paid out of federal funds, to federal civil servants: "In effect, the technicians will become federal employees, receiving the salaries, fringe and retirement benefits, but with certain administrative control regarding employment supervision remaining with the adjutants general of the jurisdiction concerned under regulations prescribed by the Secretary concerned." [30] The purpose of this changeover to federal status was apparently to create added incentives for the technicians to remain in their government jobs, rather than transferring to more lucrative positions in private industry.[31]

Noting that at the time of consideration of the bill 95% of all Guard technicians were required to be military members of the National Guard, the Senate and House Committees both recommended a continuation of this policy:

> The concept of the technician program is that the technicians will serve concurrently in three different ways: (a) Perform full-time civilian work in their units; (b) perform military training and duty in their units; and (c) be available to enter active Federal service at any time their units are called.[32]

However, it was thought that special provisions should be made to accommodate the peculiar situation wherein civilian status was dependent upon fulfillment of military obligations. For this reason, the 95% of the technicians who were required to hold military positions in the National Guard were placed in a non-competitive status within the civil service. The remaining technicians were placed in the competitive service.

---

27. For a discussion of this statute see Reservists Committee To Stop The War v. Laird, 323 F.Supp. 833 (D.D.C.1973), aff'd, 495 F.2d 1075 (D.C.Cir.1972) ; rev'd 418 U.S. 208, 94 S.Ct. 2962, 4 L.Ed.2d 706 ; 45 Comp. Gen. 405 (1966).

28. 32 U.S.C. § 709(d), (f).

29. S.Rep.No.1446, 90th Cong., 2d Sess. (1968) ; H.R.Rep.No.1823, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 3318.

30. S.Rep.No.1446 at 2 ; H.R.Rep.No.1823 at 3.

31. See statement of Maj. Gen. Francis S. Greenlief, July 29, 1969, Hearings on the Department of Defense Appropriations before the House Subcommittee of the Committee on Appropriations, 91st Cong., 1st Sess.

32. S.Rep.No.1446 at 2 ; H.R.Rep.No.1823 at 2.

The inferences to be drawn from the passage of this Act are not clear-cut. Plaintiff argues initially that the placement of the Guard technician programs outside the competitive service indicates their peculiar status and the special problems they pose for the efficient operation of the civil service. From this interpretation plaintiffs argue that any similar programs, such as the ones at issue in this case, must be established pursuant to Congressional authorization and that the CSC's independent approval of the Army and Air Force ART programs as part of the competitive service was contrary to Congress' intent. The Court disagrees.

Pursuant to section 3301 of Title 5 the President is responsible for devising standards by which individuals are to be admitted into the civil service and the duties to be performed by civil service employees. Executive Order No. 10577 [33] delegates this authority to the CSC and directs the Commission to establish positions in the competitive and excepted services:

> Sec. 1.2. *Extent of the competitive service.* The competitive service shall include: (a) All civilian positions in the executive branch of the Government unless specifically excepted therefrom by or pursuant to statute or by the Civil Service Commission . . . The Commission is authorized and directed to determine finally whether a position is in the competitive service.

> \* \* \* \* \* \*
> Sec. 2.1. *Competitive examinations and eligible registers.* . . . The Commission is authorized to establish standards with respect to citizenship, age, education, training and experience, suitability, and physical and mental fitness, and for residence or other requirements which applicants must meet to be admitted to or rated in examinations.

\* \* \* \* \* \*
Sec. 6.1. *Authority to except positions from the competitive service.* (a) The Commission is authorized to except positions from the competitive service whenever it determines that appointments thereto through competitive examination are not practicable.

■ Pursuant to 5 U.S.C. § 3101 the Army and Air Force were entitled to employ civilian ART personnel. The CSC had the power under 5 U.S.C. § 3301 and Executive Order No. 10577 to determine whether or not the ART employees should be within the competitive service and which qualifications and conditions of employment should be imposed. The agencies exercised their authority to establish the ART programs long before the National Guard program was incorporated within the Federal civil service. Unless clearly contrary to law, the Court should follow the CSC's interpretation of these statutory provisions. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

■ When Congress addressed itself to the issue of Guard technicians it indicated through the legislative reports that placement of the technicians in non-competitive status was necessitated by the military obligations accompanying the job. However, this conclusion was not framed in a manner suggesting that the non-competitive status was compelled by force of law. Rather, the reports point to the need to maintain the efficient operation of the technician programs and the civil service as the reason for the decision. No mention was made of the already existing Army and Air Force programs. Thus the passage of the National Guard Act does not support the inference that Congress was expressing the view that the Army and Air Force programs were illegal or that the CSC had abused its broad discretionary powers under section 3301 and Executive Order No. 10577. Accordingly, it is

33. 19 Fed.Reg. 7521 (Nov. 1954). There have been numerous amendments to the original Order, but none affect the provisions quoted herein.

the conclusion of the Court that the inclusion of the Army and Air Force technicians within the competitive service and the creation of a separate competitive level for the ART employees was in accordance with the civil service laws and was not arbitrary, capricious or an abuse of discretion.[34]

Plaintiffs further argue that even if the technicians have been properly placed within the competitive service, the definition of the separate competitive levels for ART employees results in the violation of special statutory benefits to which preference eligible employees are entitled. See 5 U.S.C. §§ 3312, 3351, 3363, 3504. Plaintiffs contend that only Congress may accomplish this abrogation of statutory rights, again drawing support for this position from the National Guard Technician Act, which specifically provided for the exemption of the Guard technicians from certain preference eligible benefits. 32 U.S.C. § 709(f).

Section 3312 of Title 5 provides:

In determining qualifications of a preference eligible for examination for, appointment in, or reinstatement in the competitive service, the Civil Service Commission or other examining agency shall waive—

(1) requirements as to age, height, and weight, unless the requirement is essential to the performance of the duties of the position; and

(2) physical requirements if, in the opinion of the Commission or other examining agency, after considering the recommendation of an accredited physician, the preference eligible is physically able to perform efficiently the duties of the position.

A preference eligible is similarly entitled to a waiver of these requirements when being considered for promotion to, transfer to or retention in a position in the competitive service. 5 U.S.C. §§ 3351, 3363 and 3504. These waivers are mandatory, except to the extent that the Commission is to determine whether these requirements may be essential to the performance of the duties of the position.[35]

Participation in the active reserves as a condition of civil service employment does not itself interfere with veterans' rights under the Act. The decision whether or not to join and remain in the reserves is within the control of the job applicant. Reserve membership is something which the prospective employee is free to embrace or reject. See Baum v. Zuckert, *supra*. However, when a veteran seeks entrance or promotion into an ART position and is rejected on the basis of age, height, weight or physical disability, he is entitled to the special considerations set forth in sections 3312, 3351, 3363 and 3504 of the civil service laws.

The Commission has rejected plaintiffs' claims for preference under these

---

34. Plaintiffs' reliance on section 3502 of Title 5, which directs the CSC to prescribe regulations which will give "due effect" to military preference in any RIF action, is misplaced. The Commission is granted broad discretion in devising a workable classification system which will accommodate the needs of the executive branch in a RIF action with the rights of preference eligible employees. See Hilton v. Forrestal, 83 U.S.App.D.C. 44, 165 F.2d 251 (1947), aff'd, 334 U.S. 323, 68 S.Ct. 1020, 92 L.Ed. 1416. Further, veterans' rights under § 3502 operate only *within* the employee's competitive level. This provision does not allow a preference eligible employee to displace employees in other competitive levels. Novogroski v. United States, 153 F.Supp. 421 (Ct.Cl.1957).

35. The conflict between the operation of the ART programs and these provisions of the Veterans Preference Act is exemplified in the claims of plaintiffs Minnich and Rolf, both of whom are preference eligible employees. Minnich was employed in the Army ART program when the initial reorganization was made, but was denied promotion to a higher position because he failed to satisfy the age requirements of the active reserves. Rolf sought transfer to an Air Force ART position after he received notice of a RIF affecting his non-ART job, but was rejected because he could not meet the physical requirements for entrance into the Reserves.

Plaintiffs' reference to Ms. Morton's situation is inappropriate in this context, since she is not a preference eligible employee.

provisions on the ground that reserve membership is a condition of employment which is essential to the performance of the duties of a reserve technician. If an applicant cannot satisfy the age requirement of the reserves, for example, then it is the agency's contention that a waiver is not justified because the employee would not be able to perform all of the duties of the technician position.

Although an argument may be made that the statute's focus on the *duties* of the position should be distinguished from the fulfillment of concomitant *conditions* of employment (such as the reserve membership requirement), the courts have traditionally accorded great deference to the interpretation of a statute by the agency charged with its enforcement. Udall v. Tallman, *supra*. Additional weight should be attached to the agency interpretation when Congress has had the opportunity to alter the administrative construction and has refused to do so. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). The Air Force and Army technician programs have been in force since 1957 and 1960, respectively. The documents and agreements establishing the two programs clearly set forth the reserve membership requirements and the effect they have on potential and incumbent employees. In congressional hearings on appropriations military personnel have testified on numerous occasions about the reserve technician plan and the manner in which it is operated.[36] Although we should refrain from inferring too much from congressional inactivity, it is relevant that the technician plan has been in effect for such a long period of time without any congressional interference. To the contrary, when Congress was confronted with an analogous situation in the National Guard, it opted to follow the lead of the CSC and excluded the reserve technicians from the benefits of the Veterans Preference Act. In this light, the Court concludes that the Commission's interpretation of the Veterans Preference Act, sections 3312, 3351, 3363 and 3504 in particular, and its application to the reserve technician plans is not contrary to law and not arbitrary or capricious.

## JUDGMENT

Upon consideration of defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment, the memoranda of points and authorities in support thereof and in opposition thereto, and it appearing to the Court, for the reasons set forth in the accompanying Memorandum Opinion, that there is no genuine issue as to the material facts in this case and that defendants are entitled to judgment as a matter of law, it is by the Court this 21st day of November, 1974,

Ordered that defendants' motion for summary judgment be, and the same hereby is, granted, and it is further

Ordered that plaintiffs' motion for summary judgment be, and the same hereby is, denied, and it is further

Adjudged, ordered and decreed that judgment be, and the same hereby is, entered for defendants against the plaintiffs.

---

36. See, e. g., Testimony of Brig. Gen. Felix L. Vidal, March 3, 1959, Hearings on the Department of Defense Appropriations before the House Subcommittee of the Committee on Appropriations, 86th Cong., 1st Sess.; Testimony of Maj. Gen. Joseph J. Nazarro and Brig. Gen. Felix L. Vidal, March 20, 1958, Hearings on the Department of Defense Appropriations before the House Subcommittee of the Committee on Appropriations, 85th Cong., 2d Sess.