AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
et al., Appellants,

v.

Martin R. HOFFMAN, Secretary of
the Army, et al.

No. 75–1091.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 27, 1976.

Decided Sept. 15, 1976.

Rehearing Denied Oct. 8, 1976.

**932**

Edward L. Merrigan, Washington, D.C., for appellants.

Mary-Elizabeth Medaglia, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Ellen Lee Park, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellees.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

This appeal from the District Court presents a variety of issues concerning the legality of the Reserve Technician Programs of the Air Force and the Army, under which civilian employees performing support and maintenance functions for the Air Force and Army Reserves are required, as a condition of employment, to maintain active membership in the reserve unit which they are serving. Appellants American Federation of Government Employees (AFGE), a labor organization representing large numbers of these civilian employees, and five individual employees of the Air Force and the Army, challenge the Reserve Technician Programs as

(1) totally lacking statutory authorization;

(2) contrary to several provisions of the federal civil service laws, as well as the National Guard Technicians Act of 1968, 32 U.S.C. § 709 (1970), which appellants interpret as indicating a congressional intent to keep the federal competitive civil service completely separate from the armed forces;

(3) violative of the Veterans' Preference Act of 1944, as amended, 5 U.S.C. §§ 3309–12, 3351, 3363, 3501–04 (1970); and

(4) inconsistent with the Civil Service Commission's initial agreements with the Air Force and the Army establishing the programs.

The District Court concluded that these contentions were without merit. 387 F.Supp. 63 (1974). For the reasons set forth below, we affirm.

I.

A.

In a letter dated June 25, 1957, the Civil Service Commission (CSC) authorized the Air Force to proceed with its Air Reserve Technician plan (hereinafter ART).[1] The

---

1. For purposes of most issues raised in this case, the Air Force and Army Reserve Technician programs are equivalent and will be collectively referred to as "ART." Where greater

primary goal of the plan was to increase the combat readiness of Air Force Reserve units, as well as their effectiveness in the event of mobilization. Prior to ART, the Air Reserve Flying Centers utilized for training Air Reserve Wings were maintained and operated by Air Force units which were composed of approximately half military and half civilian personnel and were organizationally separate from the reserve wings. ART, by replacing military support personnel with civil servants[2] and requiring civilian support personnel to be active reserve members, in effect integrated the support organizations into the Air Reserve Wings. In their civilian capacity, ART incumbents were to provide the basic maintenance and supply functions previously provided by the support organization; in their military capacity, ART employees were to provide training for the remainder of the wing personnel, who reported only on weekends and during summer active duty tours.[3] Since this "hard core" of highly skilled reservists would be available for immediate mobilization, the Air Force anticipated that combat readiness would be enhanced.[4]

In the letter of authorization, CSC indicated that ART was approved on the basis of two understandings with the Air Force: first, "that the Department of the Air Force will carry out both in letter and spirit the commitments it has made and the safeguards it has promised to apply with respect to employees who would be affected by the Plan"; second, that the Department's activities under the plan would comply with the Veterans' Preference Act of 1944. Appellants' Brief at 19a. In a subsequent letter describing ART to central and regional office officials of CSC, the Commission reiterated that the plan was approved only after it was satisfied "that no civilian employees presently on the roles

will be adversely affected." CSC Letter No. 57–45, June 28, 1957, Appellants' Brief at 1a. The letter went on to explain that civilian employees in positions to be included within the ART program would be given a choice: if they already belonged, or were willing to join, the local reserve wing they would be given the opportunity to become Air Reserve Technicians; if they declined or were not eligible for reserve membership, they would be reassigned at the same or higher grade to non-ART jobs in the same geographic area, as jobs became available. With respect to employees choosing the latter course, the CSC noted that the Air Force had committed itself "that there will be no reductions in force, no demotions, and no required transfers to other geographic areas for the purpose of effectuating the ART program." *Id.* at 3a. At the same time, the Commission's letter made clear that reserve membership was a condition of employment for ART positions, and, subject to the protection afforded incumbents in positions taken over by ART, job openings would be filled by persons eligible for and willing to accept active membership in the reserves.

For purposes of its reduction-in-force regulations, 5 C.F.R. Part 351 (1976), the Commission later determined that ART and non-ART positions should be placed in separate competitive levels, *see id.* § 351.403, because of the reserve membership requirement. As a consequence of this determination, non-ART personnel subjected to a reduction-in-force, unless willing and able to meet the reserve requirement, would not have the right to "bump" ART personnel, even if the ART employees had lower retention standing. *See generally id.* §§ 351.-401–.705. However, in accordance with the initial understanding between the Air Force and CSC, nonreservist incumbents of ART positions were not placed in a separate com-

---

specificity is required, the Air Force and Army programs will be identified accordingly.

2. Military support personnel were transferred to regular Air Force units.

3. ART incumbents receive the regular pay for their civilian jobs, plus military pay for their weekend and summer active duty tours.

4. It was anticipated that approximately 20% of each reserve wing would be composed of ART personnel.

petitive level from ART personnel fulfilling the reserve requirement.[5] In addition, under the terms of a 1961 agreement between CSC and the Air Force governing assumption of non-ART work by ART organizations, non-ART personnel would not be deemed to occupy a separate competitive level when the ART program took over activities previously performed by non-ART employees.[6]

The 1961 agreement also provided, however, that the Air Force could "conduct whatever future reductions may be necessary to bring the non-ART activity down to the level which will continue after consolidation" of ART and non-ART functions, and that the separate competitive level approach would be followed in carrying out these reductions. Letter of June 6, 1961, AF Exh. 3, at 21–22, ¶ 1.

The agreement further stated:

Reductions in ART and non-ART positions will be generally proportionate to the reductions in ART and non-ART work which occasioned the personnel reductions. If no specific reduction in work is involved, and the curtailment in numbers of positions results from a general "belt-tightening" or across-the-board type of reduction and reorganization, the reduction in ART and non-ART positions will be generally proportionate. Action will be taken to assure that reductions of this type are not organized so as to discriminate against non-ART and status quo personnel.

*Id.* ¶ 4.

Appellants John S. Guttenberger, Ronald R. Meadows, and Erwin P. Rolf were non-ART Air Force employees affected by reduction-in-force actions. Guttenberger and Meadows were preference eligible civil servants, *see* 5 U.S.C. § 2108 (1970), employed as powered ground equipment mechanic leaders at McGuire Air Force Base in New Jersey. Neither was a member of the active reserves. On May 6, 1969, they received notice of a reduction-in-force and were given offers of reassignment to the position of powered ground equipment mechanic. Guttenberger accepted the offer; Meadows refused and was separated on June 29, 1969.[7] Both appealed to the CSC's Regional Office in New York, on the grounds that the duties of their positions were being taken over by ART personnel, and ART employees with less job retention rights under the Veterans' Preference Act were being retained in favor of them. By virtually identical letters of August 14, 1969, the Regional Office denied Guttenberger's and Meadows' appeals, asserting that the reduction-in-force was the result of

---

5. *See* CSC Handbook X–151, Recruitment of Air Reserve Technicians Through Competitive Examination (April 1958), *appended to* Record at 9, at A–2; FPM Supp. (Internal) 930–71, Recruitment of Air Reserve Technicians Through Competitive Examination, AF Attch. 6, at A–3 (August 1966). Presumably as a means of enforcing this safeguard, a 1961 agreement between the Air Force and CSC provided that incumbents in non-ART positions generally were not to spend more than 30% of their time carrying our ART duties. *See* Letter of June 6, 1961, AF Exh. 3, at 21–22, ¶ 2.

6. The 1961 agreement provided in relevant part:

Whenever the consolidation of non-ART activities with ART activities results in the assumption in ART jobs of non-ART duties and the non-ART portion represents a significant part of the job (generally over 30%) the basis for separate competitive levels will disappear. When this happens all non-ART employees who are in the competitive level of the ART job which incorporates 30% or more non-ART duties and who cannot be assigned to non-ART positions in the geographic area without loss of grade may then compete for jobs in the ART organization without regard to the reserve membership requirement. This means they may compete first for jobs in the ART organization in the competitive level of the job containing the non-ART duties as if they were in that competitive level, and second may be given their normal reassignment or retreat rights to other jobs for which they are qualified without regard to the reserve membership requirement.

Letter of June 6, 1961, *supra* note 5, ¶ 3.

7. Meadows later accepted reinstatement to the position of power generating equipment mechanic. Appellees' Brief at 8 n. 9.

fund limitations,[8] and that "[t]he duties formerly performed by you are not being performed by the Air Reserve Technicians but are being absorbed by other civilian employees or military personnel." Appellees' Brief at 33, 36. The letters conceded that ART positions were in a separate competitive level from non-ART positions but noted that this difference in treatment complied with the applicable reduction-in-force regulations. Neither Guttenberger nor Meadows appealed to the CSC Board of Appeals and Review.

Rolf was a preference eligible civilian employee in the position of flightline mechanic at an Air Force Reserve Center in Pittsburgh, Pennsylvania. On January 7, 1969, he was notified of a reduction-in-force eliminating his position. Since Rolf failed to meet the physical requirements for reserve membership he was not offered a transfer to a position as a flightline mechanic in the ART program, and instead accepted the position of warehouseman. Rolf appealed the reduction-in-force to the Philadelphia Regional Office of the CSC, contending that refusal to allow him to transfer to an ART position because of his physical handicap was a violation of the Veterans' Preference Act and the statutory provision governing reductions-in-force, 5 U.S.C. § 3502, and that his position was abolished so that ART could take over the functions he had performed.[9] The Regional Office rejected these contentions on the grounds that reserve membership is a requisite for an ART position and Rolf was therefore not qualified for transfer into ART, and that the reduction-in-force resulted from elimination of the non-ART function of conducting combat readiness training, a function unrelated to the reserve mission of the installation. See Letter of April 22, 1969, Appellees' Brief at 38–40. Rolf appealed to the CSC Board of Appeals and Review, which issued a decision affirming the Philadelphia Regional Office.[10]

### B.

On July 5, 1960, the CSC approved an Army proposal for establishment of a Reserve Technician program almost identical to the Air Force ART program. Like the Air Force plan, the chief goal of the Army's proposal was to achieve maximum combat readiness of its reserve units. Again, CSC approval was granted on the basis of understandings that promised safeguards and commitments with respect to affected employees would be carried out and that operations under the plan would be conducted in compliance with the Veterans' Preference Act. A "Memorandum of Understanding" appended to the letter of approval delineated the promises and commitments which the Army had made, including a promise that "[t]he lack or involuntary loss of military status will not be a basis for removing present or future civilian employees," and a commitment that nonreservist incumbents

---

**8.** This ground had been clearly identified in the May 6, 1969 notices of reduction-in-force. See AF Exh. 1, at 18; AF Exh. 2, at 19.

**9.** Rolf also argued that it was improper to retain temporary employees in ART positions while denying him a transfer into ART, and that his job had included a considerable amount of ART work and therefore he was entitled to the same treatment as an ART incumbent. The Regional Office acknowledged that temporary employees were placed in ART positions but pointed out that these temporary positions were fully authorized, that the reduction-in-force regulations do not provide for placement of career employees in temporary slots, and that the temporary ART positions occupied a separate competitive level from Rolf's position. Although the Regional Office did not specifically address Rolf's claim that he

was entitled to ART incumbent status, there is some evidence in the record that such status was properly denied, see AF Exh. 3, at 37, and in any event Rolf did not press this argument either in the District Court or before this court.

**10.** In re Erwin P. Rolf, August 7, 1969, Appellees' Brief at 41–43.

Before the Board of Appeals and Review, Rolf supported his contention that the Veterans' Preference Act had been violated with the argument that it was inconsistent to deny him an ART position on the ground that he was ineligible to join the reserves, while allowing ART incumbents who no longer satisfied the reserves' physical standards to remain on the job. Although this argument was not addressed by the BAR, it appears to lack force. See note 29 infra.

in ART positions—if they could not be reassigned—would be replaced only through normal attrition or turnover so long as they performed their civilian functions in a satisfactory manner. While the Memorandum provided that "any available qualified civilians, including women" would be appointed to ART positions when persons fulfilling the reserve requirement were not available, it made no promises that nonreservist incumbents in ART positions would be considered for promotions within the program on an equal footing with reserve members. *See* Appellees' Brief at 31.

In November, 1960 the CSC issued a manual entitled "Recruitment of Army Reserve Technicians Through Competitive Examination," FPM Supp. (Internal) 930–72, which established guidelines for personnel operations within the Army's ART program. These guidelines substantially tracked the ones previously established for the Air Force:[11] reserve membership was specified as a condition of employment, and ART and non-ART positions were placed in separate competitive levels, but nonreservists occupying positions converted to ART could continue to serve in them until reassigned to non-ART positions of the same or higher grade in the same geographical area. The manual confirmed the Memorandum of Understanding's commitment to appoint nonreservists to ART positions in the absence of qualified candidates willing and able to join the reserves, but emphasized that these nonreservists—like nonreservists carried over from positions pre-dating ART—would be subject to reassignment. Nonreservist incumbents of ART positions, whether hired prior or subsequent to the ART reorganization, were not promised equal consideration for promotions with applicants satisfying the reserve requirement. This policy was reiterated in Army Reserve Reg. 140–315 (May 1, 1963), Army Exh. 3, ¶ 4.b. which stated:

In filling vacant positions, qualified candidates who are members of the Ready Reserve or who are eligible and willing to become members of the Ready Reserve . . . will be given priority in selection. However, in those situations where eligibles meeting the dual status condition are not readily available and the needs of the service dictate that the vacancy be filled in a timely fashion, a qualified nonreservist candidate may be selected to fill the position.

Appellants Samuel T. Minnich and Frances E. Morton were nonreservists employed in civilian positions with the Army at the time of the ART reorganization. Pursuant to the Memorandum of Understanding and FPM Supp. (Internal) 930–72, they were reassigned to equivalent positions within the ART program, pending transfer to appropriate non-ART jobs. However, both were ultimately denied promotions to higher positions within ART when they were unable to meet the requirements for reserve membership.

Minnich, a preference eligible employee and member of the Army's Retired Reserve, applied for a promotion to the position of ART staff administrative assistant at Indiantown Gap Military Reservation in Annville, Pennsylvania. Minnich was tentatively selected for the job, pending satisfaction of the reserve requirement, but on May 7, 1969 was denied the promotion when his age prevented him from qualifying for the active reserves. Several months prior to this action, an official of appellant American Federation of Government Employees had written to the CSC, protesting what he called "open defiance and glaring violation" of the 1960 Memorandum of Understanding with respect to promotions in Minnich's Army unit. Letter of January 15, 1969, Exh. B. In response, the director of CSC's Bureau of Inspections had explained:

11. Indeed the major differences between FPM Supp. (Internal) 930–71, promulgated to guide civil service examiners with respect to the "Recruitment of Air Reserve Technicians Through Competitive Examination," and FPM Supp. (Internal) 930–72 appear to be the inclusion with-

in the former of the 1961 agreement between the Air Force and CSC concerning the assumption of non-ART work by ART organizations, and the inclusion within the latter of the 1960 Memorandum of Understanding between the Army and CSC.

Although the Department of the Army affords Reserve members priority in hiring and promotion to higher grade technician positions, no action has been taken to adversely affect employees who were initially appointed in the absence of job applicants eligible for Reserve membership. However, if a qualified Reserve member and a qualified non-Reservist both apply for the same position, the reserve member will be given priority consideration.

Letter of Feb. 13, 1969, Exh. C.

Morton applied for a promotion to the position of administrative assistant in the ART program at the Army Hospital Center in Philadelphia. After being denied the promotion, she filed a grievance with the Army claiming sex discrimination. On February 20, 1967, the Deputy Equal Employment Opportunity Officer for the Installation dismissed her grievance, ruling that her promotion was refused not as a result of sex discrimination but instead because she did not satisfy the reserve membership requirement for the position. J.A. 140. While her appeal was pending within Army channels, Morton was offered a promotion to a staff administrative specialist position, conditioned upon fulfillment of the reserve requirement. On January 5, 1968, this promotion was also refused, since Morton was unable to satisfy the physical requirements for reserve membership. *See* Army Exh. 4. Morton then reinforced her sex discrimination claim by citing several men who were promoted within the ART program notwithstanding failure to satisfy the reserve requirement. On January 17, 1968 the Army rejected Morton's claim with the following explanation:

The fact that there are non-reservists, including yourself, in Army Reserve Technician positions is readily acknowledged. As you are aware, the policy is to appoint and promote reservists when such personnel are available. When Reservists are not available, nonreservists, including women, are considered.

Exh. F, ¶ 2. Morton pressed her claim of discrimination with the Philadelphia Regional Office of the CSC, but was denied relief by letter of March 22, 1968. *See* Exh. G.

## II.

Appellants brought this action in the District Court against the Secretaries of the Army and the Air Force and the Chairman and members of the Civil Service Commission, seeking declaratory and injunctive relief with respect to the future operation of the ART programs, and declaratory, injunctive, and monetary relief on behalf of Guttenberger, Meadows, Rolf, Minnich, and Morton. On cross-motions for summary judgment, the District Court ruled in favor of appellees.

Appellants' principal argument on appeal is that the ART programs are unlawful because they are not authorized by statute.[12] After examining the statutory framework governing the federal civil service, we are convinced, however, that the CSC and the Army and Air Force have acted within the scope of authority conferred by Congress.[13] As a threshold matter, it is clear that the Army and the Air Force have a statutory basis for employing civilian personnel. Under 5 U.S.C. § 3101, military departments are authorized to employ the number of civilian employees for

**12.** This is not the first case in which this court has considered the legality of operations under the ART program. In *Rolles v. Civil Service Commission*, 168 U.S.App.D.C. 79, 512 F.2d 1319 (1975), we held that discharge of an Air Force ART employee from his civilian position, as a result of his transfer from active to inactive reserve status, without the opportunity to show that the transfer was not for reasons "within his control," was a violation of applicable Air Force and Civil Service regulations as

well as due process of law. The statutory validity of the ART program as a whole was not in issue in that case, however.

**13.** We therefore find it unnecessary to consider whether the executive branch possesses inherent constitutional powers, independent of those conferred by Congress, sufficient to support establishment of conditions of employment such as the reserve membership requirement. *See* Appellants' Reply Brief at 12–14.

which Congress provides appropriations.[14] However, appellants do not attack the civil service status of personnel serving support functions for the military reserves; rather, they question the existence of a statutory basis for imposing the reserve membership requirement as a condition of employment in such positions.

Under 5 U.S.C. § 3301, Congress has delegated broad authority to the President to establish the qualifications and conditions of employment for civil servants within the executive branch:

> The President may—
>
> (1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service;
>
> (2) ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought;
>
> (3) appoint and prescribe the duties of individuals to make inquiries for the purpose of this section.

5 U.S.C. § 3301 (1970). The President in turn has delegated much of this authority to the CSC through Executive Order No. 10577, 19 Fed.Reg. 7521 (November 22, 1954), which provides in relevant part:

> *Sec. 1.2 Extent of the competitive service.* The competitive service shall include: (a) All civilian positions in the executive branch of the Government unless specifically excepted therefrom by or pursuant to statute or by the Civil Service Commission . . . . The Commission is authorized and directed to determine finally whether a position is in the competitive service.
>
> .     .     .     .     .
>
> *Sec. 2.1 Competitive examinations and eligible registers.* (a) . . . The Commission is authorized to establish standards with respect to citizenship, age, education, training and experience, suitability, and physical and mental fitness, and for residence or other requirements which applicants must meet to be admitted to or rated in examinations.

The validity of the reserve membership requirement must therefore be measured, first, against the terms of Executive Order 10577 and, second, for consistency with the statutory provision under which Executive Order 10577 was promulgated. *Cf. Jalil v. Hampton,* 148 U.S.App.D.C. 415, 460 F.2d 923, 927, *cert. denied,* 409 U.S. 887, 93 S.Ct. 112, 34 L.Ed.2d 144 (1972).

■ The CSC's agreements with the Army and the Air Force authorizing the ART programs, and the subsequent CSC manuals elaborating the qualifications and conditions of employment for those programs, clearly fall within Executive Order 10577's mandate to "establish standards with respect to . . . age, . . . ., training and experience, suitability, and physical and mental fitness, and for . . . other requirements . . . ." The umbrella of authority created by 5 U.S.C. § 3301 extends, however, only to those standards of admission to the civil service which "best promote the efficiency of that service." In measuring the reserve membership requirement against this constraint, we must recognize the obvious intent of Congress to confer broad discretion upon the President and the CSC, and restrict ourselves to the limited scope of judicial review which follows from this recognition. *See Gueory v. Hampton,* 167 U.S.App.D.C. 1, 510 F.2d 1222, 1225 (1974); *Polcover v. Secretary of the Treasury,* 155 U.S.App.D.C. 338, 477 F.2d 1223, 1225–27, *cert. denied,* 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). So long as the CSC acted on the basis of considerations legitimately within its purview, we are compelled to uphold its judgment if supported by a rational basis. *See, e. g., Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419

---

14. 5 U.S.C. § 3101 (1970) provides in full:

Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title [which deals with the classification of federal civil service positions] as Congress may appropriate for from year to year.

U.S. 281, 281–92, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

The ART programs were approved by the CSC only after it was convinced that the combat readiness and effectiveness of the reserves would increase as a result. We cannot say that provision for a "hard core" of highly skilled reservists is an irrational means for achieving the goal of increased combat and mobilization efficiency. As the Director of CSC's Bureau of Inspections explained with respect to the Army ART program:

> Technicians are an integral part of the Army Reserve and they possess certain skills essential to the unit if it should be called to active duty. Since the transition from a Reserve status to active duty is critical, dual status personnel, who have been working for the unit and are familiar with unit administrative requirements are employed when the unit is mobilized to enable the critical functions to be performed effectively. When a substitute must replace a technician who does not accompany his unit, the function performed will suffer in some degree.

Letter of Feb. 13, 1969, Exh. C. Since the task of civilian support personnel obviously is to promote the effectiveness of reserve operations, a condition of employment which promises to enhance the reserves' ability to fulfill their combat mission is not unreasonable. We therefore agree with the Sixth Circuit's conclusion in *Baum v. Zuckert*, 342 F.2d 145 (6th Cir. 1965), that the reserve membership requirement satisfies the statutory standard of promoting the efficiency of the civil service.[15]

Appellants maintain that Section 3301 does not constitute statutory authority for establishment of the reserve membership requirement because it does not *expressly* provide for imposition of military service as a condition of civilian employment. Moreover, appellants argue in passing that the ART programs violate the due process and equal protection guarantees embodied in the fifth amendment of the Constitution. While these arguments are not compelling in isolation,[16] appellants' due process claim—given the context of administrative action not expressly directed by statute—merits serious consideration in

---

15. The *Baum* case held that discharge of a preference eligible Air Force ART employee from his civilian position, following his reassignment from the active to the inactive reserves, satisfied the standard imposed by what is now 5 U.S.C. § 7512(a), which provides:

> An agency may take adverse action against a preference eligible employee, or debar him for future appointment, only for such cause as will *promote the efficiency of the service.*

5 U.S.C. § 7512(a) (1970) (emphasis supplied).

16. Any claim based on equal protection or substantive due process would appear to be foreclosed by our finding that the ART program survives scrutiny under a "rational basis" standard. *See, e. g., Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Moreover, we would have thought it clear beyond peradventure that specific agency actions need not be expressly authorized in order to fall within the bounds of statutory authority. While it may be true, as appellants argue, that only *Congress has the constitutional authority* to require citizens to engage in military service, *see* Appellants Reply Brief at 2–11, we fail to see the logic of appellants' assertion that express statutory authority for the ART program is therefore required. So long as the defendants in this case have acted pursuant to authority properly delegated by Congress, it would seem that Congress's constitutional powers have not been infringed.

Appellants argue that passage of the National Guard Technicians Act of 1968, 32 U.S.C. § 709 (1970), creating within the federal civil service a program in which civilian employees performing support functions for the National Guard may be required to maintain membership in the National Guard as a condition of employment, indicates the need for some statutory authority for the ART program other than 5 U.S.C. § 3301. This argument is wholly without merit. At the time the National Guard Technicians Act was passed, 95% of the Technicians were already required to be members of the National Guard, as a result of state regulations. *See* H.R.Rep.No.1823, 90th Cong.,2d Sess., at 4 (1968), 3 U.S.Code Cong. & Admin. News p. 3321 (1968). The primary purpose of the Act was to convert the National Guard technicians from a status of state employees paid out of federal funds, to federal civil servants, in order to provide them with uniform and adequate retirement and fringe benefit programs. *See* S.Rep.No.1446, 90th Cong., 2d Sess., at 1–2 (1968); H.R.Rep.No.1823, *supra* at 1–3, 3 U.S.Code Cong. & Admin.News at p. 3318–20.

light of the Supreme Court's recent decision in *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), which was announced subsequent to oral argument in this case.

In *Mow Sun Wong* the Court, in an opinion by Justice Stevens, held that a Civil Service Commission regulation barring noncitizens from most positions in the federal competitive civil service deprived lawfully admitted resident aliens of liberty without due process of law. The regulation had been promulgated pursuant to the same executive order, Executive Order No. 10577, which forms the basis of the Commission's authority in the case at hand. The Commission advanced three rationales in support of the citizenship requirement: first, the broad exclusion of noncitizens might constitute a "bargaining chip" which would facilitate the President's negotiation of treaties with foreign powers; second, the regulation created incentive for aliens to qualify for naturalization; and third, the need for undivided loyalty in certain sensitive positions justified a citizenship requirement in at least some parts of the civil service, and the broad exclusion avoided the administrative burden of identifying and classifying those sensitive positions. 96 S.Ct. at 1905–06. The Court assumed for the sake of argument that the first two rationales would be sufficient to justify the citizenship requirement if it were *expressly* imposed by Congress or the President, *id.* at 1906, 1910, 1911, but, after analyzing the framework of statutory provisions and executive orders, concluded that "the Commission may either retain or modify the citizenship requirement without further authorization from Congress or the President," *id.* at 1910, and thus the citizenship regulation was in no sense *"required,"* *id.* at 1906, by any act of Congress or the President. The Court then found that the first two rationales advanced by CSC to support the regulation were not "properly the business of

the Commission," *id.* at 1910–11; *see also id.* at 1906, and therefore could not properly be relied upon by CSC "in making a decision implicating the constitutional and social values at stake" in the case, *id.* at 1910. The Court did find, however, that the third rationale—the administrative desirability of a *per se* rule "when it is manifest that citizenship is an appropriate and legitimate requirement for some important and sensitive positions," *id.* at 1911—was within the scope of the only appropriate concern of the Commission, "the promotion of an efficient federal service," *id.* at 1911 & n. 47, *citing* 5 U.S.C. § 3301(1). But this rationale was nonetheless deemed inadequate as well, since the Commission had not made known the reasons for the regulation, there was no evidence that the Commission had made a considered evaluation of the relative desirability of the simple exclusionary rule and the alternative of a larger pool of eligible employees, the administrative burden of classifying sensitive positions did not appear to be particularly onerous, and the consequence of the regulation was the "wholesale deprivation of employment opportunities." *Id.* at 1911.

We think that *Mow Sun Wong* supports, rather than undermines, our conclusion that establishment of the ART programs was a proper exercise of the Commission's authority under Executive Order No. 10577 and 5 U.S.C. § 3301. The rationale for the ART programs—increasing the combat readiness and effectiveness of the reserves—is analogous to the interest in assuring the undivided loyalty of civil servants employed in sensitive positions: the reserve membership requirement, like the citizenship requirement with respect to sensitive positions, contributes to the fulfillment of the employing agency's mission. The considerations underlying the ART programs thus are clearly encompassed within the Supreme Court's conception of the "promotion of an efficient federal service." [17] More-

---

17. We have no doubt that the statutory directive which merely requires such regulations "as will best promote the efficiency of [the] Service," as well as the pertinent Executive order, gives the Civil Service Commis-

sion the . . . discretion . . . [to] either retain or modify the citizenship requirement without further authorization from Congress or the President.
96 S.Ct. at 1910.

over, unlike the situation in *Mow Sun Wong,* the Civil Service Commission carefully considered the desirability of establishing the reserve membership requirement, clearly articulated the reasons for approval of the requirement, and tailored the program to carry out its underlying purpose without unduly infringing on the interests of employees affected by its implementation.[18] The reserve membership requirement was limited to personnel serving support functions for the reserves;[19] and nonreservist incumbents were subject to reassignment, but not discharge.

### III.

Appellants contend that, even if the Civil Service Commission otherwise would have the authority to impose the reserve membership requirement, it is foreclosed from doing so by statutory provisions which indicate a congressional intent to segregate the federal competitive civil service from the armed forces. In particular, appellants cite 5 U.S.C. §§ 2101, 2105(d) and a provision of the National Guard Technicians Act of 1968, 32 U.S.C. § 709(d).[20] Section 2101 sets out the definition of "civil service" for the purpose of Title 5:

> (1) The "civil service" consists of all appointive positions in the executive, judicial, and legislative branches of the Government of the United States except positions in the uniformed services;
>
> . . . .

5 U.S.C. § 2101(1) (1970). "Uniformed services" is in turn defined by subsections (2) and (3) of section 2101 to include the Army and the Air Force. While this section clearly means that personnel serving in the Army and the Air Force are not *ipso facto* civil servants, it does not preclude civil servants from simultaneously maintaining membership in the armed forces.[21] Indeed, as the District Court noted, 387 F.Supp. at 71, ART employees are in a similar position in this respect to other civil servants who voluntarily maintain membership in the re-

---

**18.** The Court in *Mow Sun Wong* was careful not to foreclose reasonable classifications of civil service positions based on considerations properly within the scope of CSC's concern:

> . . . even though the argument of administrative convenience may not support a total exclusion, it would adequately support a rather broad classification of positions reflecting the considered judgment of an agency expert in personnel matters. For the classification itself would demonstrate that the Commission had at least considered the extent to which the imposition of the rule is consistent with its assigned mission.

*Id.* at 1911 n. 48.

We note also that the impact of the ART program falls most heavily upon nonreservists, *a group which hardly could be described in the manner in which the Court characterized the resident aliens involved in Mow Sun Wong:* ". . . an identifiable class of persons who, entirely apart from the rule itself, are already subject to disadvantages not shared by the remainder of the community." *Id.* at 1905. *See also id.* at 1905 n. 22, *citing In re* Griffiths, 413 U.S. 717, 721, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (resident aliens a "discrete and insular" minority).

**19.** Moreover, the 1961 agreement between the Air Force and CSC provided that "non-ART jobs will be established to the fullest extent within the ART organization to perform . .

non-ART work." Letter of June 6, 1961, *supra* note 5, ¶ 2.

**20.** Appellants also cite 5 U.S.C. § 2105(c), which provides:

> An employee paid from nonappropriated funds of the Army and Air Force Exchange Service, Army and Air Force Motion Picture Service, Navy Ship's Stores Ashore, Navy exchanges, Marine Corps exchanges, Coast Guard exchanges, and other instrumentalities of the United States under the jurisdiction of the armed forces conducted for the comfort, pleasure, contentment, and mental and physical improvement of personnel of the armed forces is deemed not an employee for the purpose of—
> (1) laws administered by the Civil Service Commission; . . . .

5 U.S.C. § 2105(c) (Supp. V, 1975). However, as the District Court pointed out, 387 F.Supp. at 71, this provision is clearly inapplicable to the ART program, since ART personnel are not paid out of nonappropriated funds and are not employed by an instrumentality which fits the statutory description.

**21.** Nothing in the rather limited legislative history of section 2101 suggests a conclusion to the contrary. *See* S.Rep.No.1380, 89th Cong., 2d Sess., at 46 (1966); H.R.Rep.No.901, 89th Cong., 1st Sess., at 26 (1965).

serves.[22] It should be noted that the CSC has provided for separation of ART employees' civilian and military functions to the extent practicable. Army ART personnel are not required to wear uniforms or to observe the requirements of military courtesy except when functioning in their military capacity. *See* Memorandum of Understanding, July 5, 1960, Appellees' Brief at 31, ¶¶ 6–7. While serving in their civilian capacity, ART employees are governed by civil service laws and regulations.

■ Section 2105(d) also does not constitute a bar to establishment of the ART program. In full, the section provides:

(d) A Reserve of the armed forces who is not on active duty or who is on active duty for training is deemed not an employee or an individual holding an office of trust or profit or discharging an official function under or in connection with the United States because of his appointment, oath, or status, or any duties or functions performed or pay or allowances received in that capacity.

5 U.S.C. § 2105(d) (1970). Appellants' reading of this provision is subject to the same logical flaw which undermined their reading of section 2101: while the section indicates that reserve members are not "employees" of the United States simply because of their reserve status it does not prevent employees of the United States from becoming reserve members. The purpose of Section 2105(d) was simply to exempt reserve members who were not otherwise employed by the United States from

statutory restrictions on activities of federal employees, *e. g.,* the Hatch Political Activity Act, *as amended,* 5 U.S.C. §§ 7324–25 (1970). *See* H.R.Rep.No.1884, 71st Cong., 2d Sess., at 2 (1930); S.Rep.No.1102, 71st Cong., 2d Sess., at 2 (1930).

Appellants cite the National Guard Technicians Act of 1968 for the proposition that it was unlawful to establish ART within the *competitive* civil service. The National Guard Technicians Act converted National Guard technicians—95% of whom were required by state regulations to maintain membership in the National Guard as a condition of employment—into federal civil servants, *see* note 16 *supra,* but in so doing placed these dual status personnel outside the competitive service.[23] Both the House and Senate Committee Reports explained the reason for the technicians' noncompetitive status as follows:

The noncompetitive status is necessary for the technicians in view of (a) requirement for holding a concurrent military Guard status as a condition for employment and (b) the fact that civilian employment is terminated where the concurrent military status ceases to exist.

H.R.Rep.No.1823, 90th Cong., 2d Sess., at 6, 3 U.S.Code Cong. & Admin. News p. 3324 (1968); S.Rep.No.1446, 90th Cong., 2d Sess., at 5 (1968).

■ Notwithstanding some similarities between the National Guard Technicians program and the ART programs, we do not think it was unreasonable for CSC to include ART employees within the competitive service.[24] The job tenure of employees

---

**22.** Appellants attempt to blunt the force of this argument by suggesting that there is a difference between voluntary and "forced, involuntary" membership in the reserves. Appellants' Brief at 37. We concede that the Civil Service Commission must have some basis of authority for establishing reserve membership as a condition of employment, but we do not see the relevance of the voluntary-involuntary distinction for purposes of interpreting Section 2101.

**23.** The Act provides in relevant part:

A technician . . . is an employee of the Department of the Army or the Department of the Air Force, as the case may be, and an employee of the United States. However, a position authorized by this section is outside

the competitive service if the technician employed therein is required . . . to be a member of the National Guard.
32 U.S.C. § 709(d) (1970).

**24.** All civil service positions in the executive branch which are not subject to confirmation by the Senate are automatically part of the competitive service unless specifically excepted "by order or under statute." *See* 5 U.S.C. § 2102(a)(1) (1970). Under Executive Order No. 10577, described previously, the President has delegated limited authority to the CSC to determine whether positions should be placed outside the competitive service:

*Sec. 1.2. Extent of the competitive service.* The competitive service shall include:

in the competitive service is protected by a variety of procedural and substantive safeguards not accorded members of the excepted service. For example, the protections of the Lloyd-La Follette Act with regard to removal or suspension without pay apply only to employees in the competitive service:

(a) An individual *in the competitive service* may be removed or suspended without pay only for such cause as will promote the efficiency of the service.

(b) An individual *in the competitive service* whose removal or suspension without pay is sought is entitled to reasons in writing and to—

(1) notice of the actions sought and of any charges preferred against him;

(2) a copy of the charges;

(3) a reasonable time for filing a written answer to the charges, with affidavits; and

(4) a written decision on the answer at the earliest practicable date.

Examination of witnesses, trial, or hearing is not required but may be provided in the discretion of the individual directing the removal or suspension without pay. Copies of the charges, the notice of hearing, the answer, the reasons for and the order of removal or suspension without pay, and also the reasons for reduction in grade or pay, shall be made a part of the records of the employing agency, and, on request, shall be furnished to the individual affected and to the Civil Service Commission.

5 U.S.C. §§ 7501(a), (b) (1970) (emphasis supplied). These safeguards have been expanded upon by Civil Service Regulations which include provision for a right of appeal to the Civil Service Commission. *See* 5 C.F.R. §§ 752.201–.203 (1976).[25] The significance of the Lloyd-La Follette Act for employees in the ART program was made abundantly clear by this court in *Rolles v. Civil Service Commission,* 168 U.S.App.D.C. 79, 512 F.2d 1319 (1975), which held that an ART employee could not be discharged from his civilian position because of his transfer from active to inactive reserve status, without an opportunity to show that the transfer was not for reasons "within his control." [26] At the same time, it is important to recall that an ART incumbent who loses active reserve status is subject to reassignment to the first available non-ART position at the same grade in the same geographical area. The military efficiency of the reserve unit is thus substantially

---

(a) All civilian positions in the executive branch of the Government unless specifically excepted therefrom by or pursuant to statute or by the Civil Service Commission . . . under section 6.1 . . . .

. . . . . .

*Sec. 6.1. Authority to except positions from the competitive service.* (a) The Commission is authorized to except positions from the competitive service *whenever it determines that appointments thereto through competitive examination are not practicable. Upon the recommendation of the agency concerned, it may also except positions which are of a confidential or policy-determining character.*

Executive Order No. 10577, 19 Fed.Reg. 7521 (November 22, 1954) (emphasis added). However, since appellants would not be benefitted by a transfer of ART employees from the competitive to the excepted service, we presume that the thrust of their argument is not that the CSC should have placed ART outside the competitive service, but rather that given the dual status of ART personnel it was unreasonable to place them within the competitive service. In

light of our conclusion on the latter issue, it is unnecessary to decide whether or not the CSC would have the power to place ART personnel in the excepted service.

**25.** The only employees in the excepted service who are covered by these regulations are preference eligible employees who have completed one year of service. *See* 5 C.F.R. § 752.-201(a)(3) (1976).

**26.** The *Rolles* court found this result to be required by applicable Civil Service and Air Force regulations and, as an alternative holding, by due process of law.

Some of the other protections granted employees in the competitive service are summarized by 5 C.F.R. § 212.301 (1976), which provides in relevant part:

An individual with competitive status may be, without open competitive examination, reinstated, transferred, promoted, reassigned, or demoted, subject to conditions prescribed be [sic] the Civil Service rules and regulations.

preserved notwithstanding the protection afforded ART incumbents.

In passing the National Guard Technicians Act, Congress chose to give less job protection to National Guard technicians than the Civil Service and the Army and Air Force had granted to ART incumbents. State adjutant generals administering National Guard programs are directed to discharge from civilian employment any dual status technician who is separated from the National Guard, whether such separation was with or without cause. See 32 U.S.C. § 709(e)(1) (1970).[27] The statute expressly provides that the right to appeal such an action does not extend beyond the adjutant general. *Id.* § 709(e)(5). Because Congress felt that the military needs of the National Guard outweighed the value of providing procedural and substantive safeguards for incumbents in the National Guard technician program does not mean, however, that it was an abuse of the CSC's discretion under Executive Order No. 10577 to provide such safeguards for ART technicians. Congress is of course free to except the ART program from the competitive service if it deems such action appropriate.

## IV.

■■■ Appellants' final set of statutory arguments focuses on the application of the ART program to preference eligible veterans. See 5 U.S.C. § 2108 (1970). Appellants contend that the reserve membership requirement operates to deprive veterans of their rights under the Veterans' Preference Act of 1944 and, more particularly, 5 U.S.C. §§ 3312, 3351, 3363, 3504 (1970).[28] These

---

**27.** In *Tennessee v. Dunlap,* 426 U.S. 312, 96 S.Ct. 2099, 48 L.Ed.2d 660 (1976), the Supreme Court confirmed this interpretation of § 709(e)(1) and, in contrast to *Rolles,* held that such a "chain reaction" discharge was not a violation of due process since the property interest created by the National Guard Technicians Act did not extend beyond the guardsman's term of enlistment.

**28.** Appellants also contend that ART violates veterans' retention preference rights under 5 U.S.C. § 3502, which provides in relevant part:

(a) The Civil Service Commission shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to—
(1) tenure of employment;
(2) military preference, subject to section 3501(a) of this title;
(3) length of service; and
(4) efficiency or performance ratings.

. . .

(b) A preference eligible employee whose efficiency or performance rating is "good" or "satisfactory" or better than "good" or "satisfactory" is entitled to be retained in preference to other competing employees. A preference eligible employee whose efficiency or performance rating is below "good" or "satisfactory" is entitled to be retained in preference to competing nonpreference employees who have equal or lower efficiency or performance ratings.

However, this provision by its terms applies only to "competing" employees; since ART employees occupy a separate competitive level from non-ART employees, the provision does not grant veterans in the latter category a preference over employees in the former category. *See, e. g., Elder v. Brannan,* 341 U.S. 277,

283–85, 71 S.Ct. 685, 95 L.Ed. 939 (1951); *Hilton v. Forrestal,* 83 U.S.App.D.C. 44, 165 F.2d 251 (1947), *aff'd sub nom. Hilton v. Sullivan,* 334 U.S. 323, 68 S.Ct. 1020, 92 L.Ed. 1416 (1948); *Novogroski v. United States,* 153 F.Supp. 421, 427 (Ct.Cl.1957). Moreover, for the reasons discussed previously with regard to establishment of reserve membership as a condition of employment *see* part II *supra,* the CSC had a reasonable basis for making reserve membership a ground for separate competitive levels.

Appellants cite a section of the National Guard Technicians Act of 1968—32 U.S.C. § 709(f)(1970), which makes 5 U.S.C. §§ 2108, 3502, 7511, and 7512 inapplicable to the National Guard technicians program—for the proposition that the protections of the Veterans' Preference Act cannot be abrogated except through specific action by Congress, and that as a result ART must be conducted in compliance with the Act. We could not agree more. As discussed in this footnote and in text below, the ART programs *are* being conducted so as to carry out the provisions of the Act. In this regard, it should be noted that merely because § 3502 is of no aid to preference eligible non-ART employees who wish to "bump" ART personnel, this does not mean that the Veterans' Preference Act has no application to ART employees or, for that matter, to non-ART employees. In addition to the safeguards accorded preference eligible ART and non-ART employees by Sections 7511 and 7512 of Title 5, both groups of employees are protected by § 3502 as against non-preference eligibles of the same competitive level *within their respective groups.*

provisions instruct the Civil Service Commission, in determining the qualifications of a preference eligible individual for examination, appointment, or reinstatement (§ 3312), for transfer (§ 3351), for promotion (§ 3363), and for retention (§ 3504), respectively, to waive

(1) requirements as to age, height, and weight, unless the requirement is essential to the performance of the duties of the position; and

(2) physical requirements if, in the opinion of the Commission or other examining agency, after considering the recommendation of an accredited physician, the preference eligible is physically able to perform efficiently the duties of the position.

5 U.S.C. §§ 3312, 3351, 3363, 3504 (1970). The claim of appellant Rolf, a non-ART employee who was subjected to a reduction-in-force and was refused transfer into an ART position because he failed to meet the physical requirements for reserve membership, is representative of the potential conflict between ART and § 3351; the claim of appellant Minnich, who was refused promotion within ART because he failed to satisfy the reserves' age requirement, exemplifies the potential conflict between ART and § 3363.

Before the District Court, the CSC conceded that to meet the statutory provisions a showing had to be made that satisfaction of the reserves' age and physical requirements was necessary for the efficient performance of ART incumbents' duties, but asserted that the required showing was made out by the following syllogism: reserve membership is a condition of employment which is essential to the performance of a reserve technician's duties; satisfaction of the reserves' age and physical requirements is necessary in order to gain reserve membership; therefore, satisfaction of the

age and physical requirements is necessary in order to perform the duties of the technician position in a satisfactory manner. *See* 387 F.Supp. at 74–75. The District Court saw a potential discrepancy between the statute's focus on the ability to perform the *duties* of the position and the Commission's emphasis on the importance of reserve membership as a *condition of employment,* but ultimately deferred to the Commission's interpretation of the Act. *See id.* at 75.

Finding the syllogism drawn by CSC convincing, and the distinction between duties and conditions of employment largely illusory in this context, we conclude that the ART program does not violate 5 U.S.C. §§ 3312, 3351, 3363, 3504. Whether continued membership in the reserves is called a duty or a condition of employment, the fact remains that the purpose of the ART program would be undermined if individuals who failed to gain admission to the reserves were freely hired into the program.[29] The District Court's analogy of the reserve membership requirement to the requirement that employees in some civil service positions be members of the bar, *see* 387 F.Supp. at 71, carries special force here: were a state bar association to impose certain prerequisites for admission to the bar, the CSC would have little choice but to defer to the association's judgment. If appellants feel that the age and physical requirements for admission to the reserves are irrational or otherwise in violation of the law, the proper recourse is to bring suit directly challenging those requirements. For the purposes of this appeal, we must assume that the age and physical standards are rationally related to the reserves' combat mission; as such, there is little doubt that the standards contribute to the effective performance of an important duty of ART employees—maintaining themselves in a position to increase the combat readiness and effectiveness of reserve units.

---

**29.** At the same time, we do not think that the protection granted to nonreservist incumbents in positions taken over by ART, to nonreservists who are hired when no reserve members are available, and to ART incumbents who involuntarily lose their active reserve status, undermines the rationality of the ART program. Although these individuals cannot be discharged for failure to meet the reserve membership requirement, they are subject to reassignment to the first available non-ART job of the same grade in the same geographical area.

## V.

■ Appellants attempt to buttress their claim under the Veterans' Preference Act by noting that the original agreements between the CSC and the Army and Air Force contained provisos promising that the ART programs would be conducted in strict compliance with the Veterans' Preference Act. Given our conclusion that ART does not violate the Act, it of course follows that the agreements have not been violated in this regard either.[30] However, at several points in their brief, appellants assert a broader inconsistency between the initial agreements and subsequent practice under the ART programs: appellants claim that CSC, the Army, and the Air Force abandoned the terms of the initial agreements and pursued a course designed to eliminate non-ART employees while retaining ART employees; more particularly, they contend that the reduction-in-force procedures followed with respect to the Air Force ART program,[31] and the establishment of separate competitive levels for ART and non-ART employees in both the Army and the Air Force, fail to satisfy the armed forces' initial promises that "safeguards" would be adopted to protect incumbent Civil Service employees affected by the ART plans.

■ Inconsistent agency action without adequate explanation would, of course, be cause for reversal. As Judge Leventhal stated in *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841, 852, *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971),

An agency changing its course must apply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored. *See also, e. g., Atchison, T. & S.F. R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *International Union, UAW v. NLRB,* 148 U.S. App.D.C. 305, 459 F.2d 1329, 1341 (1972).

We have examined the record with great care and, having found that subsequent CSC, Army, and Air Force statements of policy are not facially inconsistent with the initial agreements, and that all of the individual appellants either were treated in a manner consistent with the agreements or are not in a position to bring their claims before this court, we see no cause for reversing the District Court's judgment in favor of appellees.

Any claim of inconsistency with respect to promotion policies can easily be answered. While guaranteeing that nonreservist incumbents in positions taken over by ART, and nonreservists hired when reserve members were unavailable, would not be removed or discharged because they lacked reserve status, neither the 1960 Memorandum of Understanding between the Army and CSC nor CSC Letter No. 57–45 explaining the terms of the 1957 agreement between the Air Force and CSC indicates that nonreservist incumbents would be considered for promotion within the ART program on an equal basis with individuals who satisfied the reserve membership requirement. To the contrary, both documents indicated that nonreservist incumbents would be subject to reassignment to equivalent non-ART positions, and CSC Letter No. 57–45 specifically stated that job openings would be filled by persons eligible for and willing to accept active membership

---

30. The provisos would be difficult to explain if the Veterans' Preference Act provided no protection for ART and non-ART incumbents. However, as explained previously, *see* note 28 *supra,* the portions of the Act codified in 5 U.S.C. §§ 7511 and 7512 inure to the benefit of preference eligible employees both within and outside the ART program, and the retention preference rights granted by 5 U.S.C. § 3502 are fully applicable as against non-preference eligibles within the same competitive level.

31. Appellants' brief characterizes the 1961 agreement between the Air Force and CSC regarding the assumption of non-ART work by ART organizations, incorporated into FPM Supp. (Internal) 930–71, *see* note 11 *supra,* as being fully applicable to the Army ART program as well. We have been unable, however, to find any indication in the record that the Army and CSC entered into an agreement similar to the 1961 agreement with the Air Force.

in the reserves.[32] FPM Supp. (Internal) 930–71 and 930–72, as well as Army Reg. 140–315, continued this policy of giving qualified reserve members priority over nonreservist incumbents attempting to gain promotions within the ART program. The refusal to promote Minnich and Morton was a straightforward application of this policy.

Establishment of separate competitive levels for ART and non-ART positions was also fully consistent with the 1960 Memorandum of Understanding and CSC Letter No. 57–45. CSC Letter No. 57–45 stated that there would be no reductions-in-force for the purpose of effectuating the ART program, see p. 933 supra, but did not promise that individuals employed in non-ART positions at the time of ART's creation would be granted retreat rights to ART positions in the event of a reduction-in-force not related to the effectuation of ART. Indeed, the letter stressed that reserve membership was to be a condition of employment for the ART program. Allowing nonreservists subjected to a reduction-in-force to transfer into the ART program would of course have hindered achievement of the goal of increased combat readiness.

Appellants' allegation of an inconsistency between CSC Letter No. 57–45 and the reduction-in-force procedures subsequently adopted for the Air Force ART program is somewhat more troublesome. Some of the language in the 1961 agreement between the Air Force and CSC regarding the assumption of non-ART work by ART organizations appears to be in potential conflict with the pledge in CSC Letter No. 57–45 that there would be no reductions-in-force for the purpose of effectuating ART. In particular, ¶ 1 of the 1961 agreement provides:

The Air Force may conduct whatever future reductions may be necessary to bring the non-ART activity down to the level which will continue after consolidation. In these reductions the separate competitive level concept will be followed. The Air Force may anticipate in these reductions the eventual numbers, types, and grades of employees it will need to conduct the remaining non-ART functions after the consolidations.

Letter of June 6, 1961, supra. This potential conflict appears to be remedied, however, by ¶ 4 of the agreement, which provides in relevant part:

Reductions in ART and non-ART positions will be generally proportionate to the reductions in ART and non-ART work which occasioned the personnel reductions. If no specific reduction in work is involved, and the curtailment in numbers of positions results from a general "belt-tightening" or across-the-board type of reduction and reorganization, the reduction in ART and non-ART positions will be generally proportionate. Action will be taken to assure that reductions of this type are not organized so as to discriminate against non-ART and status quo personnel.

Id.[33] So long as a conversion of non-ART positions to ART positions is not considered to be a reduction in non-ART work, ¶ 4 would appear to carry out CSC Letter No. 57–45's pledge. And, so long as ¶ 4 is read as a constraint on the Air Force's authority under ¶ 1 to order reductions in non-ART personnel, the agreement as a whole is not inconsistent with Letter No. 57–45.

Although the 1961 agreement is not a model of clarity, we cannot say that it is inconsistent on its face with prior statements of policy. Until we are presented

---

**32.** This is not surprising since allowing nonreservists full promotion rights would have undercut the purpose of the ART program to place dual status personnel in important support positions.

**33.** ¶ 3 of the agreement also was sensitive to the need to protect non-ART incumbents from unfair discrimination: where ART employees were spending a substantial portion of their

time doing non-ART work, ART and non-ART employees would be considered to be in the same competitive level. See note 6 supra. However, being allowed to retreat to an ART position in the event of a reduction-in-force is not sufficient in and of itself to satisfy CSC Letter No. 57–45's pledge that there would be no reductions-in-force to effectuate ART.

with instances in which the agreement has been applied by the Air Force in a manner inconsistent with the safeguards promised by CSC Letter No. 57–45, we must presume that the Air Force and the CSC have adopted a consistent line of action.

Regardless of the merits of the general claim that the 1961 agreement is inconsistent with CSC Letter No. 57–45, it is clear that individual appellants Guttenberger, Meadows, and Rolf may not gain relief based on that theory. Although there is ample evidence in the record that the reduction-in-force affecting Guttenberger and Meadows resulted from fund limitations rather than an absorption of their duties by the ART program, *see* Appellees' Brief at 33, 36; AF Exh. 1, at 10, 16, 18; AF Exh. 2, at 11, 17, 19, we agree with the District Court's conclusion, 387 F.Supp. at 69, that their claims must be denied for failure to exhaust administrative remedies. *See, e. g., McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *Hall v. United States Civil Service Commission,* 174 U.S.App.D.C. 468, 533 F.2d 695 (1976); *Young v. Higley,* 95 U.S.App. D.C. 122, 220 F.2d 487 (1955). Guttenberger and Meadows were informed of their right to appeal the adverse decisions of the Regional Office to the CSC Board of Appeals and Review, *see* 5 C.F.R. §§ 752.203, 772.310 (1976), but failed to take advantage of the opportunity. Under these circumstances, where the claim involves potential inconsistency in the agency's actions, it is particularly important—in terms of respect for the agency's decision-making processes and aid to the court in framing the issues, as well as to promote judicial economy—for the agency "to be given a chance to discover and correct its own errors." *McKart v. United States, supra,* 395 U.S. at 195, 89 S.Ct. at 1663.

Unlike Guttenberger and Meadows, appellant Rolf did exhaust his administrative remedies by unsuccessfully appealing to the Board of Appeals and Review. However, since there is substantial evidence in the record that the reduction-in-force which affected Rolf was not made for the purpose of effectuating the ART program, we see no inconsistency with CSC Letter No. 57–45, and as a result Rolf's claim for relief must also be denied. *See, e. g., Polcover v. Secretary of the Treasury,* 155 U.S.App.D.C. 338, 477 F.2d 1223, 1225–26, *cert. denied,* 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). The decision of the Philadelphia Regional Office in Rolf's case states that the reduction-in-force resulted from elimination of the non-ART function of conducting combat readiness training, a function which assertedly was unrelated to the reserve mission of Rolf's installation. *See* Letter of April 22, 1969, Appellees' Brief at 38–40. Moreover, internal Air Force communications reproduced in the record indicate that the reduction-in-force resulted from manpower and budgetary restrictions and that the non-ART personnel were not forced to bear more than a proportionate share of the reduction. Of 483 positions included in the reduction, 408 were ART positions and 75 were non-ART positions. *See* AF Attch. 39.

The judgment of the District Court is therefore

*Affirmed.*